[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14004

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

LAKESIA L. HARDEN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 3:19-cr-00003-DHB-BKE-2

_____

Before GRANT, LUCK, and HULL, Circuit Judges.

LUCK, Circuit Judge:

The Supreme Court has said that a warrantless search of a probationer's home, supported by reasonable suspicion of criminal activity and authorized by a probation condition, is reasonable under the Fourth Amendment. *See United States v. Knights*, 534 U.S. 112, 122 (2001). The question here is whether a warrantless search of a probationer's home that is otherwise reasonable as to the probationer is rendered unreasonable merely because a non-probationer is occupying the home. Joining our sister circuit, we hold that it is not where the occupant knows about the probation. *See Smith v. City of Santa Clara*, 876 F.3d 987 (9th Cir. 2017).

An officer searched Tremayne Linder's home without a warrant because he was on probation, one of his conditions authorized warrantless home searches, and the officer had reasonable suspicion that marijuana was in the home. Those circumstances made the search reasonable. *See Knights*, 534 U.S. at 122. It was not rendered unreasonable merely because Linder's girlfriend (Lakesia Harden), who knew Linder was on probation, was an occupant of the home. For that reason, the district court properly denied the motions to suppress the drugs found in Linder's home and the statements that resulted from finding the drugs. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On March 21, 2016, a Georgia superior court sentenced Linder to twenty years of probation after he pleaded guilty to

burglary and attempted armed robbery.  His probation came with the condition that he "not violate the criminal laws of any governmental unit."  But he violated that condition by using marijuana.  So, on January 12, 2018, the state court imposed additional probation conditions.  For example, Linder had to "enroll in, attend, and complete all phases" of a drug treatment program.  And he had to "submit to a search of his . . . person, residence, papers, vehicle, and[] effects . . . , any time of the day or night with or without a search warrant whenever requested to do so by a [p]robation [s]upervisor or any law enforcement officer."  That condition allowed for "the use of anything seized as evidence in a judicial or disciplinary proceeding."

Linder signed the orders imposing the new conditions, acknowledging that his probation may be revoked if he violated them.  But he violated his conditions again by missing mandatory meetings of his drug treatment program.  So, on April 5, 2018, the state court issued a warrant for his arrest.

At the time, Linder shared his home with Harden, his girlfriend, and the couple shared the same bedroom.  Harden knew Linder was on probation.  When Probation Officer Timothy Ray visited Linder's home before April 2018, Harden answered the door "a few times" and would "bring [Linder] to the door so [Officer Ray] could talk to him" about his probation.

On April 9, 2018, Officer Ray and Dublin Police Department Sergeant Eric Roland went to execute the arrest warrant at Linder's home.  As soon as they walked up to the front door, Sergeant

Roland smelled a "very strong odor" of marijuana.  Officer Ray smelled it, too.  Harden met the officers at the door.  Linder was not at the home, although Harden's child was there and her sister, Tamara Harden, was visiting.

Harden told the officers that Linder was at a drug treatment meeting.  But Officer Ray placed a call and confirmed that Linder was not at the meeting.  Harden then invited the officers inside the home, saying, "you can come look if you want to."  Sergeant Roland entered the home while Officer Ray stayed by the door.

Once inside, Sergeant Roland noticed that the marijuana smell "intensified" to a "very pungent odor," "probably the strongest smell [he's] smelled inside of a residence since [he has] been working in policing."  He told Harden that the officers were "probably about to conduct [a] search" of the home.  Before the search, Sergeant Roland confirmed with Officer Ray that Linder's probation conditions included a warrantless search condition.  And Sergeant Roland again confirmed—this time with Officer Ray's supervisor—that Linder had "search conditions on his residence."  Sergeant Roland then announced into his radio, while in the living room in Harden's presence, that he planned to search the home based on Linder's probation search condition.  Harden did not respond or object in any way to Sergeant Roland's announcement.

Sergeant Roland's search did not last long.  Because the marijuana smell was "powerful," he found its source in "probably [thirty] seconds."  He went from the living room to a "little hallway area" and "smelled in each bedroom until [he] got to" Harden and

Linder's shared bedroom.  As soon as he smelled inside the couple's bedroom, Sergeant Roland "could tell that the odor was coming from that area."  He walked in and traced the smell to a closet that the couple also shared.  Inside the closet, Sergeant Roland found a camouflage tote bag that contained a black backpack.  And, inside the backpack, he found twelve small bags of marijuana and meth-amphetamine wrapped in electrical tape.

After he found the drugs, Sergeant Roland arrested Harden and read her *Miranda*[1] rights.  Harden initially said the drugs weren't hers and that she didn't know who they belonged to.  But she later admitted that she was holding the drugs in the closet for a "close friend."

Harden was indicted for possessing marijuana and metham-phetamine with the intent to distribute them, in violation of 21 U.S.C. section 841(a)(1) and 18 U.S.C. section 2.  She moved to sup-press the marijuana and meth found during Sergeant Roland's search, plus her post-arrest statements as fruits of the allegedly un-lawful search.  But the district court denied the suppression mo-tions.  At trial, the government admitted the drugs and Harden's statements into evidence, and the jury found her guilty as charged in the indictment.

Harden appeals the denial of her suppression motions.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

## STANDARD OF REVIEW

When we review the denial of suppression motions, we review the district court's factual findings for clear error and its application of the law de novo. *United States v. Spivey*, 861 F.3d 1207, 1212 (11th Cir. 2017). "[W]e review the entire record, including trial testimony," not just "the record made at the suppression hearing." *United States v. Newsome*, 475 F.3d 1221, 1224 (11th Cir. 2007).

## DISCUSSION

Harden argues on appeal that the warrantless probation search of the bedroom she occupied with Linder violated the Fourth Amendment. We disagree.

### *A.*

The Fourth Amendment protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "As the text makes clear, 'the ultimate touchstone of the Fourth Amendment is reasonableness.'" *Riley v. California*, 573 U.S. 373, 381 (2014) (marks omitted) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).

In "the ordinary case," a warrantless search is unreasonable. *Illinois v. McArthur*, 531 U.S. 326, 330 (2001) (quoting *United States v. Place*, 462 U.S. 696, 701 (1983)). And warrantless searches of homes "are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). But not always. "When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the [Supreme] Court has found that

certain . . . circumstances may render a warrantless search . . . reasonable." *McArthur*, 531 U.S. at 330–31 (listing examples); *see also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995) (explaining that, although "reasonableness generally requires the obtaining of a judicial warrant," "a warrant is not required to establish the reasonableness of *all* government searches; and when a warrant is not required . . . , probable cause is not invariably required either").

One circumstance that can render a warrantless search reasonable, as recognized in *Griffin v. Wisconsin*, 483 U.S. 868 (1987), is where law enforcement has reasonable grounds to search a probationer's home and the warrantless search is authorized by state law. In *Griffin*, a probationer's "home [was] searched by probation officers acting without a warrant." *Id.* at 870. The officers had received "information from a detective . . . that there were or might be guns in [the probationer]'s apartment," and a state regulation provided that probationers' homes could be searched without a warrant "as long as there [we]re 'reasonable grounds.'" *Id.* at 871 (citation omitted).

The Supreme Court concluded that "[t]he search . . . was 'reasonable' within the meaning of the Fourth Amendment because it was conducted pursuant to a valid [state] regulation governing probationers." *Id.* at 880. "A probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" *Id.* at 873. But, the Court explained, it has "permitted exceptions when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-

cause requirement impracticable.'" *Id.* (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, J., concurring in the judgment)). The special needs exception justified the state's regulation because "[s]upervision [of probationers] is a 'special need' of the [s]tate permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large." *Id.* at 875; *see also id.* at 879–80. Unlike the public at large, a probationer's liberty is restricted by conditions imposed as part of an ongoing criminal sentence, "requir[ing] . . . supervision" of his activities "to assure that the restrictions are in fact observed." *Id.* at 874–75 ("Probation is simply one point (or, more accurately, one set of points) on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service."). Those "restrictions are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large." *Id.* at 875 ("[T]he importance of supervision has grown as probation has become an increasingly common sentence for those convicted of serious crimes." (citation omitted)).

*Griffin*'s "'special needs' holding made it 'unnecessary to consider whether,'" even without a state regulation, warrantless searches of a probationer's home "[a]re otherwise reasonable within the meaning of the Fourth Amendment." *Knights*, 534 U.S. at 117–18 (quoting *Griffin*, 483 U.S. at 878, 880). But both the Supreme Court and this court have since considered that question. The Supreme Court addressed it in *Knights*, where the probationer had been convicted of a drug offense. *Id.* at 114. A condition of his

probation, which he acknowledged by signing the probation order, was that he "would '[s]ubmit his . . . person, property, place of residence, vehicle, [and] personal effects[] to search at anytime, with or without a search warrant.'" *Id.*

Shortly after he was placed on probation, the probationer's apartment was surveilled by a detective. *Id.* at 114–15. The detective observed suspicious activity tying the probationer to a recent arson. *Id.* Specifically, he saw the probationer's friend exit the apartment with what looked like pipe bombs. *Id.* at 115. And he saw the probationer's friend bring padlocks stolen from the crime scene, a Molotov cocktail, and a gas can to the apartment. *Id.* Relying on those observations, plus the probation search condition, the detective searched the apartment without a warrant. *Id.*

The Supreme Court applied its "general Fourth Amendment approach of 'examining the totality of the circumstances'"— balancing the probationer's reasonable expectation of privacy against the government's need for the search—and held that "no more than reasonable suspicion" was required to search the apartment. *Id.* at 118–21 (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). As to the probationer's privacy interests, the Court again emphasized that "[i]nherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" *Id.* at 119 (marks omitted) (quoting *Griffin*, 483 U.S. at 874). That is because, "[j]ust as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the

offender of some freedoms enjoyed by law-abiding citizens." *Id.* The *Knights* probationer, in particular, was expressly informed of a warrantless search condition—a "salient circumstance" that "significantly diminished [his] reasonable expectation of privacy" in his apartment. *Id.* at 118–20.

On the other side of the balance, the state's need for searching the probationer's apartment was substantial. *See id.* at 120–21. Reemphasizing what it explained in *Griffin*, the Supreme Court said that "[t]he [s]tate has a dual concern with a probationer." *Id.* It grants probation on "the hope that [the probationer] will . . . be integrated back into the community" but, on the other hand, there is "the concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the community." *Id.* ("[I]t must be remembered that 'the very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law.'" (quoting *Griffin*, 483 U.S. at 880)). "And probationers have even more of an incentive to . . . quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation, and possible incarceration" if the evidence is discovered. *Id.* at 120. These heightened interests, stacked up against "the probationer's significantly diminished privacy interests," justified the "lesser than probable-cause standard"—reasonable suspicion—and "render[ed] a warrant requirement unnecessary." *Id.* at 121.

20-14004                Opinion of the Court                11

For our part, in *United States v. Carter*, 566 F.3d 970 (11th Cir. 2009), we extended *Knights* to circumstances where there was no search condition authorizing the warrantless search of the probationer's home.[2]  The *Carter* probationer had been convicted of felony battery and cocaine possession.  *Id.* at 971–72.  "[H]e did not have a condition of probation that required him to submit to warrantless searches of his home," but he did have conditions "requir[ing] him to answer all inquiries made by his probation officer[] and submit to visits by the probation officer at his home, workplace, or elsewhere."  *Id.* at 974–75.  Despite no condition specifically allowing warrantless home searches, officers searched the probationer's home without a warrant because they had reasonable suspicion he was trafficking drugs.  *Id.* at 972, 975.

Applying the balancing test from *Knights*, we concluded the search was reasonable.  *Id.* at 971.  We acknowledged that the probationer had a "higher" reasonable expectation of privacy than the *Knights* probationer because his home wasn't subject to a warrantless search condition.  *Id.* at 974–75.  "[N]evertheless," we

---

[2] *Cf. United States v. Yuknavich*, 419 F.3d 1302, 1309–11 (11th Cir. 2005) (concluding that warrantless search of probationer's computer inside his home was reasonable because, although there was no condition requiring warrantless searches of the computer, specifically, he had already "violated the terms of his release" and "the terms of his probation severely restricted his ability to access the Internet"); *Castillo v. United States*, 816 F.3d 1300, 1303–06 (11th Cir. 2016) (concluding that warrantless search of the defendant's home was reasonable because, as part of a *pretrial intervention program*, his privacy expectation was diminished by "conditions that allowed home visits from an officer" and by being "subject to supervision").

explained, "[the probationer]'s expectation of privacy was [still] reduced by the condition . . . requiring him to submit to home visits by his probation officer." *Id.* On the other hand, the government's interest "in monitoring [the probationer] on account of his drug and violence-related crimes" was "high." *Id.* at 975. So, because the balance was similar to *Knights*, we found that no more than reasonable suspicion was required for the warrantless search. *Id.*

Following *Knights* and *Carter*, neither the Supreme Court nor this court have considered whether a warrantless search of a probationer's home "that is otherwise reasonable as to the probationer[ is] unreasonable as to a non-probationer occupant of the residence." *See Smith*, 876 F.3d at 991. But the Ninth Circuit addressed that question in *Smith*. *See id.* at 991–94.

The *Smith* probationer—who was on probation for grand theft and forgery—drove the getaway car for a friend who stabbed someone. *Id.* at 989. Officers knew the terms of her probation allowed warrantless searches of her home. *Id.* at 988. So, they went to the house she "reported [as] her address to probation," and her mother answered the door. *Id.* at 989. The mother "refused to admit the officers . . . without a warrant" and told them that the probationer didn't live there. *Id.* at 988–89. But the officers searched the home anyway. *Id.* at 988. The mother and her minor granddaughter (who was also present) then sued the officers and the city under 42 U.S.C. section 1983 and a similar state statute, alleging the search was unreasonable under the Fourth Amendment. *Id.* at 989–90.

Applying the balancing test from *Knights*, the Ninth Circuit concluded that the otherwise reasonable warrantless search of the probationer's home was not rendered unreasonable simply because her mother and granddaughter occupied the same home. *See id.* at 993–94. The court balanced the mother and granddaughter's reasonable privacy expectations against the government's need for the search. *Id.* As for the privacy interests, the court acknowledged that, usually, "[a] non-probationer . . . has a higher expectation of privacy than someone who is on probation." *Id.* at 994. Nevertheless, the court explained, the mother and granddaughter's privacy interests "in the home that [they] *share*[*d*] *with* [*a*] *probationer*" were diminished and outweighed by the government's "heightened interest" in locating someone convicted of "serious offenses," who reoffended by participating in a violent stabbing, and who was more likely than the average citizen to offend again. *Id.* (emphasis added).

We agree with the Ninth Circuit that an otherwise reasonable warrantless search of a probationer's home is not rendered unreasonable merely because the home is occupied by another person who knows about the probation. The reasonable expectation of privacy inside the probationer's home is similar to what it would be if the home was not occupied by another person—it is diminished. That's because "[i]nherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" *Knights*, 534 U.S. at 119 (marks omitted) (quoting *Griffin*, 483 U.S. at 874). "Just as other punishments for criminal convictions curtail an offender's freedoms," the sentencing court

imposes conditions on a probationer that "deprive [him] of some freedoms enjoyed by law-abiding citizens." *Id.*; *see Gall v. United States*, 552 U.S. 38, 48 (2007) (listing standard conditions for federal probationers, such as "report[ing] regularly to their probation officer, permit[ting] unannounced visits to their homes, refrain[ing] from associating with any person convicted of a felony, and refrain[ing] from excessive drinking" (citing U.S.S.G. § 5B1.3)). These conditions "require . . . supervision" of the probationer's activities "to assure that the restrictions are in fact observed." *Griffin*, 483 U.S. at 874–75. The need for supervision does not change just because another person happens to occupy the probationer's home.

In addition, where the occupant knows about the probation, as Harden did here, she understands that she has a diminished expectation of privacy inside the probationer's home—just as she would in other places that are closely supervised and where one expects diminished privacy. *Cf. United States v. Ramsey*, 431 U.S. 606, 616 (1977) (explaining that "searches made at the border, pursuant to the long-standing right of the sovereign to protect itself . . . , are reasonable simply by virtue of the fact that they occur at the border"); *United States v. Herzbrun*, 723 F.2d 773, 775–76 (11th Cir. 1984) (discussing how "airport security checkpoints and loading gates are sui generis under the [F]ourth [A]mendment" partially because "the person to be searched . . . voluntarily come[s] to and enter[s] the search area" (quoting *United States v. Skipwith*, 482 F.2d 1272, 1275–76 (5th Cir. 1973))); *United States v. Prevo*, 435 F.3d 1343, 1348 (11th Cir. 2006) (reasoning that a prison visitor had a

"negligible" privacy expectation in her car, considering how she drove past two signs warning her that it could be searched).

The fact that the probationer's home is occupied by a non-probationer also does not change the government's need for the search—it's substantial. As the Supreme Court emphasized in *Knights* and *Griffin*, the government "has a dual concern with a probationer"—"rehabilitation and protecting society from future criminal violations." *Knights*, 534 U.S. at 119–21; *see Griffin*, 483 U.S. at 874–75 ("[Probation] restrictions are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large."). These "goals . . . justify the exercise of supervision," even inside a probationer's home, and "the importance of supervision has grown as probation has become an increasingly common sentence for those convicted of serious crimes." *Griffin*, 483 U.S. at 875. Here, for example, Linder was already convicted of serious crimes—burglary and attempted armed robbery—and reoffended by violating his drug-related probation conditions twice. *Cf. id.* at 879 ("In some cases—*especially those involving drugs* . . . —the probation agency must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before a probationer does damage to himself or society." (emphasis added)); *Smith*, 876 F.3d at 994 (emphasizing that "the police knew . . . th[e probationer] was serving a felony probation term for serious offenses"); *Carter*, 566 F.3d at 975 (same, as to a probationer convicted of felony battery and cocaine possession).

Indeed, "the very assumption" of probation is that the probationer is a greater public safety threat because he "is more likely than the ordinary citizen to violate the law." *Griffin*, 483 U.S. at 880; *cf. Samson v. California*, 547 U.S. 843, 853–54 (2006) (concluding that the government's interest in reducing recidivism among parolees justified a suspicionless search because they are likely to reoffend and "grave safety concerns . . . attend recidivism"). Given that risk, the government must be able "to respond quickly" to evidence a probationer has actually reoffended because "the possibility of expeditious searches" deters recidivism, *Griffin*, 483 U.S. at 876 ("A warrant requirement would interfere to an appreciable degree with the probation system . . . ."), and the probationer is more likely to "dispose of incriminating evidence" than the average criminal, knowing that he "face[s] revocation" if it's discovered, *Knights*, 534 U.S. at 120.

So, as the *Smith* court concluded, the balance shakes out the same way it did in *Knights*. *See Smith*, 876 F.3d at 993–94. The government's "interest[] in reducing recidivism and thereby promoting reintegration and positive citizenship [of a] probationer[]" outweighs the reduced privacy expectations inside a probationer's home, "warrant[ing] privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Samson*, 547 U.S. at 853 (citing *Griffin*, 483 U.S. at 879; *Knights*, 534 U.S. at 121); *see Smith*, 876 F.3d at 993–94. Thus, we hold that a warrantless search of a probationer's home, based on reasonable suspicion and a probation condition allowing warrantless searches, is not rendered

20-14004               Opinion of the Court                    17

unreasonable because the home was occupied by another person who knew about the probation.[3]

### B.

Applied here, the warrantless search of Linder's home, while it was occupied by Harden, was reasonable. Linder was on probation, and one of his conditions was that he had to "submit to a search of his . . . residence. . . , any time of the day or night with or without a search warrant whenever requested to do so by a

---

[3] A half-dozen state courts have reached the same conclusion and struck the same balance. *See State v. Adams*, 788 N.W.2d 619, 624–25 (N.D. 2010) ("[The defendant non-probationer] voluntarily chose to live with a probationer, and he assumed the risk that he too would have diminished Fourth Amendment rights . . . ."); *State v. Hamm*, 589 S.W.3d 765, 779–81 (Tenn. 2019) ("We conclude that the privacy intrusion [of a probation search] upon an individual sharing a bedroom (i.e., an area with common authority) with a probationer is not so invasive that it would not be tolerated under the Fourth Amendment."); *State v. Bursch*, 905 N.W.2d 884, 890–92 (Minn. Ct. App. 2017) ("[W]e hold that a non-probationer who knowingly lives with a probationer has a diminished expectation of privacy in areas of the residence shared with the probationer."); *Milton v. State*, 879 P.2d 1031, 1035 (Alaska Ct. App. 1994) ("Courts generally hold that a person who agrees to house a probationer retains a limited expectation of privacy in his person, possessions, and residence. This expectation of privacy is limited because the probation officer is entitled to search the probationer, the probationer's possessions, and the probationer's residence."); *State v. Yule*, 905 So. 2d 251, 254–55 (Fla. Dist. Ct. App. 2005) (applying *Knights* and concluding the warrantless search of a probationer's home didn't violate the Fourth Amendment where he had a non-probationer co-occupant); *cf. Russi v. Superior Court*, 108 Cal. Rptr. 716, 720–21 (Cal. Ct. App. 1973) (reasoning that "a probationer's residence should not be made sanctuary for [one's] contraband" because he has a non-probationer co-occupant).

[p]robation [s]upervisor or any law enforcement officer." Sergeant Roland searched Linder's home based on that warrantless search condition. *See Knights*, 534 U.S. at 118 (describing a search condition as a "salient circumstance"). And Harden knew Linder was on probation. When Officer Ray visited Linder's home before April 2018, Harden would answer the door and "bring [Linder] to the door so [Officer Ray] could talk to him" about his probation. *Cf. Carter*, 566 F.3d at 974–75 (reasoning that a probationer's expectation of privacy was reduced by a condition requiring home visits).[4]

Finally, Sergeant Roland had reasonable suspicion to search Linder's home. *See Knights*, 534 U.S. at 121–22. Both Officer Ray and Sergeant Roland smelled marijuana while at the front door. And once Sergeant Roland was invited inside by Harden, the odor "intensified" to what was "probably the strongest" marijuana odor he ever smelled inside a home. The smell was so "powerful" that

---

[4] We recognize that on appeal Harden argues that she personally did not consent to the search, Linder's probation condition was not a search consent as to her, and she was not obligated to object to the search for the search to be unreasonable. However, as discussed above, in a warrantless search of a probationer's home pursuant to a probation condition and reasonable suspicion, the reasonableness of the search does not require "consent" of either the probationer or another occupant of the home who knows a cotenant is on probation. *See Smith*, 876 F.3d at 994 ("Under [*Griffin* and *Knights*], probation searches are not analyzed as consent searches. . . . . Instead, the question is whether a warrantless probation search that affects the rights of a third party is reasonable under the totality of the circumstances."); *see also Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990) ("What [a defendant] is assured by the Fourth Amendment itself . . . is not that no government search of his house will occur unless he consents; but that no such search will occur that is 'unreasonable.'").

20-14004               Opinion of the Court                    19

it took him only thirty seconds to find the drugs during the search. "[T]he smell of marijuana alone may provide a basis for reasonable suspicion." *United States v. White*, 593 F.3d 1199, 1203 (11th Cir. 2010).[5]

## CONCLUSION

Because Sergeant Roland had reasonable suspicion for the search, and Linder's probation conditions allowed for warrantless searches, the warrantless search of Linder's home was reasonable. The fact that Linder's home was occupied by Harden, who knew about the probation, did not render the otherwise reasonable warrantless search unreasonable. And because the search was reasonable, it did not violate the Fourth Amendment. The district court properly denied the motions to suppress.

**AFFIRMED.**

---

[5] The smell of marijuana alone also provided probable cause for Sergeant Roland's search. *See, e.g., United States v. Legeza*, 559 F.2d 441, 442 (5th Cir. 1977) ("This Court has repeatedly held . . . that the odor of marijuana provides sufficient probable cause . . . ." (listing cases)); *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc) (reasoning there was "no doubt" of probable cause to search a house "when, as the door stood open, [an agent] detected what he knew from his law enforcement experience to be the odor of marijuana").